CECELIA A. HUNTER, ADMINISTRATRIX, ETC., V. ROBERTS, THROP & CO. (A CORPORATION) ET AL.

*Corporations—Dividends—Equity.*

Courts of equity will not interfere in the management by the directors of the affairs of a corporation unless it is clearly made to appear that they are guilty of fraud or misappropriation of the corporate funds, or refuse to declare a dividend when the corporation has a surplus of net profits which it can, without detriment to its business, divide among its stockholders, and when a refusal to do so would amount to such an abuse of discretion as would constitute a fraud, or breach of that good faith which they are bound to exercise towards the stockholders.

Appeal from St. Joseph. (Loveridge, J.) Argued April 24 and 25, 1890. Decided November 14, 1890.

Bill to compel the directors of a corporation to declare and pay a dividend. Complainant appeals from a decree dismissing her bill. Affirmed. The facts are stated in the opinion.

*S. M. Constantine* and *W. G. Howard* (*T. R. Sherwood,* of counsel), for complainant, contended:

1. The court of chancery has power to compel the directors of a corporation to declare a dividend when, without reasonable cause, they refuse or neglect to do so; citing *Beers v. Spring Co.,* 42 Conn. 17; *Pratt v. Pratt,* 33 Id. 455; *Robinson v. Smith,* 3 Paige, 222; *Scott v. Fire Co.,* 7 Id. 203.

*B. E. & L. F. Andrews* and *Pealer Bros.,* for defendants, contended:

1. A request to the board of directors to declare a dividend was a condition precedent to bringing suit; citing *Lockwood v. Boom Co.,* 42 Mich. 537; *Detroit v. Dean,* 106 U. S. 541; *Hawes v. Oakland,* 104 Id. 450; and the doctrine that proof of a request is not necessary where it appears that it would result in a

refusal can only apply in matters concerning which the directors have no discretion; citing *Williams v. Telegraph Co.*, 93 N. Y. 184; *Oglesby v. Attrill*, 105 U. S. 605; *Memphis v. Dean*, 8 Wall. 75; *Dudley v. Kentucky High School*, 9 Bush, 578; 1 Mor. Priv. Corp. §§ 240 *et seq.*, 450.

2. The discretionary power vested in the board of directors by How. Stat. § 4132, in the absence of fraud or what is equivalent thereto, and of which there is no evidence in this suit, is final and binding, and cannot be controlled by the courts; citing 1 Mor. Priv. Corp. §§ 276, 447, 460; *Moss' Appeal*, 83 Penn. St. 264; *Williams v. Telegraph Co.*, 93 N. Y. 192; and the directors have the best means of knowing the condition of the corporation, and of forming a correct estimate of its resources and liabilities; citing *Barnard v. Railroad Co.*, 7 Allen, 521; and they may use profits in the development of the corporate business; citing 1 Mor. Priv. Corp. § 447; *Moss' Appeal*, 83 Penn. St. 264; *Minot v. Paine*, 99 Mass. 101; *Elevator Co. v. Railroad Co.*, 85 Tenn. 703; *Gordon's Ex'ors v. Railroad Co.*, 78 Va. 501.

CHAMPLIN, C. J. Roberts, Throp & Co. is a manufacturing corporation organized under the laws of the State of Michigan, and engaged in the manufacture of threshing-machines and other agricultural implements. Complainant's intestate was a stockholder in the corporation, and she has filed the bill of complaint in this case to compel the directors of the corporation to declare and pay a dividend. The bill of complaint was dismissed by the court below, who filed a written opinion in the cause, which has been returned with the record. After a careful perusal of the testimony, I am led to the conclusion reached by the circuit judge, and mainly for the reasons given by him in his opinion, as follows:

"The defendant is a corporation duly organized under the laws of this State, and has been engaged in the business of manufacturing principally threshing-machines for many years at Three Rivers, in this county. The articles of association provide for $250,-000 capital stock, but $80,000 only has ever been issued. This amount was issued before 1881, and was fully paid up. The complainant, as such administratrix, holds $6,000 of this stock, for which her former husband, Lothrop, paid, in 1881, $9,000. Since

then no dividend has been made by said corporation defendant, and the complainant files this bill to compel the defendant to declare a dividend on its capital stock of $80,000, alleging that it has surplus profits which should be set apart and used for that purpose. No request has ever been made to the defendant's board of directors to declare a dividend, but since a majority of such directors have been witnesses upon this trial, and have testified that they would not have declared a dividend if a request had been made, I think it should be held for the purposes of this trial that no request was necessary.

"It is undoubtedly true that the ultimate object for which every corporation of the character of the one under consideration is formed, is the payment of dividends to its individual members. While this is true, it is also true that the declaring of such dividends must ordinarily be left to the sound discretion of boards of directors. Whether a corporation can safely make a dividend involves the exercise of knowledge and judgment, and the power of deciding this question should not be taken from the directors, and assumed by the courts, unless it clearly appears that the directors have mistaken their legal duties. Any other rule would lead to the frequent intervention of the courts, to the substitution of the court for the board of directors, and, in very many instances, would prove disastrous to the best interest of the corporation and its stockholders, and the business of trading and manufacturing would be seriously hampered and retarded. To authorize the court to intervene, and decree a dividend, it ought, in the first place, to appear clearly that there are surplus profits to divide, and that such profits can be separated from the necessary working capital, for the purpose of a dividend, without serious detriment to the interest of the stockholders and the prosperity of the business of the corporation. It ought to appear that there is no good reason for withholding a division of the surplus earnings among the stockholders, and that they are withheld from the will or caprice of the directors. If there is reasonable cause for withholding the dividend, then it ought not to be decreed.

"The evidence shows that the books of the company are kept in excellent system, and with great accuracy, and a full and fair showing has been made of the business and condition of the company. Although there have been losses, it cannot be said but that they were unvoidable, and incident to the necessary risks of the defendant's business. The evidence further discloses that the directors are men of large experience in business affairs; that they are familiar with all the details of the business of the company; and that, according to their best judgment, for the best interests of the stockholders, a dividend cannot now, and could not have been,

made, and in this respect their opinions are at unity. The evidence
entirely fails to disclose that the directors, in not declaring div-
idends, have been actuated by malice or improper motives. They
are largely interested in the corporation, and in their testimony
say that, as individuals, they would have been glad to have
declared a dividend, and had themselves the benefit of it, if the
condition of the finances of the company would have permitted
such action; but they declare emphatically that such dividend can-
not be made without great detriment to the best interests of the
company and its stockholders. And, since these directors are men
of high standing as business men, and of unquestioned integrity, I
am bound to believe that, according to their best and united judg-
ment, a dividend ought not to be made.

"I am aware that it is pretty well settled by authority that
'there can be such a condition of things as will justify a court of
equity in compelling directors to declare a dividend contrary to
their judgment;' but when a board of directors made up of ex-
perienced business men, largely interested in the welfare of the
corporation, familiar with all its affairs, and influenced by no
improper motive, declares that a dividend cannot be made without
serious detriment to all concerned, then the court ought to proceed
with great caution in decreeing a dividend, and the facts proven
upon the trial ought clearly to justify such action. It is necessary,
therefore, to look somewhat into the condition of the company in
order to determine whether the court ought to order a dividend
against the best judgment of the directors.

"In 1881 the company was largely reorganized. Before that
time it had been doing a very successful business. During that
year, Throp, or the Throp family, sold out their interests in the
real estate, tools, and fixtures, and some other property, to Rob-
erts, receiving in cash $60,000, and receiving also one-half of all
the available assets of the company, consisting of paper owing to
the company, and amounting in gross to $100,000, or over. As far
as the evidence discloses, the $80,000 of stock was before this sale
owned by Roberts and Throp. Roberts became the purchaser of
the Throp interest. He thereupon sold to other persons a consider-
able portion of the stock on the same basis that he had bought of
Throp; that is, 1½ for each share. This, upon the $80,000 paid-up
stock, aggregated $40,000. Since then it has been carried upon the
books, and appears in some of the annual statements as a surplus
fund of $40,000. In fact, it was regarded as a premium on the
stock for the good-will of the business. So far as stock was
sold, this premium was received by Roberts individually, and did
not go to the benefit of the funds of the company. Considering
the actual value of the company's property, it is questionable

whether the stock of the company has any real value above par. The $40,000 for good-will was largely speculative, based upon the supposed ability of the company to make money in the future.

"When the company began business after this partial reorganization, its property consisted of its real estate, the tools, machinery, and fixtures, and probably some material and unfinished work. It had no money. Its available assets had been divided and appropriated between Roberts and Throp, and among its first acts was to borrow $1,000 to meet current expenses. On the basis paid by the new stockholders, the value of the stock should have been $120,000. They undoubtedly expected that, if it was not then worth that amount, it would be made good by the earnings of the company. Among these new stockholders was the complainant's decedent, who had a position and salary as an employé of the company, and was familiar with its financial condition and affairs. Since the company, after the sale and division between Roberts and Throp, had no money or available means, it must have been contemplated by the stockholders and directors that the first manufactured products of the company would be obtained by means of borrowed money, and that for a considerable time to come the earnings and profits of the company must be applied to its floating debts, and the expenses of manufacturing and selling its products, and development of its business. It must have been contemplated that the company would engage exclusively in the business for which it was organized, and especially so in the somewhat new existence that it entered upon after the reorganization.

" Courts cannot but take notice of the fact that the competition in all kinds of manufactured goods is so severe (and the evidence shows that it is especially so in the line of threshing-machines) that the profit upon each article is small, and in no other way can money be made than by manufacturing, putting upon the market, and selling a large number of the manufactured articles. Considering the value of the plant, and the amount of money paid by the new holders for their stock, it could not have been contemplated that the company would restrict its business, and build but a small number of machines. Such action would inevitably have defeated the evident intention and expectations of the stockholders. And it must have been quite as evident that a large business could not be carried on without a large amount of working capital. As the stockholders were not called upon to furnish this, it could not be supplied in any other way than from the earnings of the company. From these earnings the business of the company has been carried on from year to year for a period of some eight years, and the directors testify that at no time during this period could they safely take from these earnings any money, and set it apart for the purpose of declaring a dividend.

" " The period of time at which the complainant asks the court to interpose and decree a dividend is at or about the time of filing her bill, December 1, 1887. An examination of the financial report and balance sheet of December 12, 1887, discloses the fact that at that time there was no money on hand from which a dividend could be paid. The bills receivable, or paper and accounts owing to the company, are the only resources from which money could be realized to make a dividend. It must have been obtained in that way, or by borrowing the money for that purpose on the credit of the company. The reports show that at that time the floating indebtedness of the company was large, but the bills receivable were largely in excess of such indebtedness; and counsel for complainant has argued, with much force, that a sufficient amount can be safely spared from this excess, and the money realized upon it, to make a dividend.

" A careful consideration, however, of the nature of this paper, and the condition of the company's business, satisfies me that this cannot be done in the exercise of that prudence and care which is essential to the safety of the company's business, and the substantial interests of the stockholders. The evidence shows that this paper, taken in payment of the company's machines, is long-time paper, running from one to four years. Its actual value is from 60 to 70 per cent. of its face, but could not be sold for more than 50 per cent. A much larger amount could be realized upon it if left in the control of the company's agents than in any other manner, and if placed in hostile hands it would endanger the company's business in making future sales. The machines for the sales of the coming season must necessarily be built in early winter, and the expenses for material and labor correspondingly large. In the usual course of collection, no more money can be realized from bills receivable than is actually necessary to pay the expenses of material, manufacturing the goods, insurance, taxes, and expenses of making sales and collections, and not enough to extinguish readily the floating indebtedness of the company. The so-called 'surplus profits' are tied up in this paper, and it is evident that a sufficient sum cannot be got out of it to make any considerable dividend without great sacrifice, and not then except at the necessity of driving the company to add largely to its indebtedness to obtain money to carry on its business and pay its current expenses.

" The complainant, in her bill, sets forth the embarrassments of the estate of which she is administratrix, and the financial condition of her family. This state of her affairs is well calculated to appeal to the sympathies of the court, and to lead it to endeavor to find a way within the bounds of the law and the evidence to afford adequate relief. It is evident that a small dividend, such a one as the company might perhaps, without great sacrifice, raise the

money to pay, would be of but little assistance to the complainant. Her counsel ask the court to make an order for a dividend of 100 per cent. upon the $80,000 of issued stock. A sum much less than this would not relieve the complainant from her financial needs. On the other hand, the raising of $80,000 on the bills receivable for the purpose of making a dividend would, it is evident, so embarrass the company, and deprive it of means to carry on its business, as to involve it in disaster, and probably in irretrievable ruin, and the stock held by the complainant would be involved in the disaster. The directors, acting in good faith, are positively of the opinion that a dividend cannot be ordered without grave injury to the interests of the company and its stockholders. They are the legally appointed agents and trustees of the stockholders, and their judgment should not lightly be disregarded. I am also satisfied that the evidence fully sustains the judgment of the directors.

"The bill must be dismissed, but without costs against the complainant."

The corporation was organized in 1875, with an authorized capital of $250,000, only $80,000 of which was paid in. It did business until March, 1881, when a change was made in its stockholders, one of the Roberts purchasing the Throp interest, which was represented by 1,600 shares at $25 each, for which he paid $60,000. At this time the notes and money were divided, leaving the corporation without available capital or means to carry on the business. In this crisis the corporation resorted to borrowing, and from that time until December 12 following it had borrowed money and obtained credit to the amount of $37,903.71, of which $26,756.14 was represented by bills payable, and the balance in open account. The sales of its manufactured articles have been made in several states from Michigan to Texas and the Dakotas, and are made through agents or traveling salesmen, and mostly upon a credit of from three to four years. Notes of the purchasers have been taken upon sales, which, from the length of time and the distance of the parties, have not been bankable paper, and the corporation has been obliged to be a steady borrower and purchaser upon credit year by year. In 1882, its bills and accounts pay-

able amounted at the close of business, December 12, to $72,954.54; in 1883, to $59,787.65; in 1884, to $89,989.91; in 1885, to $69,880.46; in 1886, to $84,088.15; in 1887, to $81,006.91. These items show that it required a large amount of ready money to carry on the business, and it was laid out in merchandise purchased, additional tools and machinery, and the expenses necessary to the manu-facture and sale of the manufactured product, as shown in the respective accounts upon the books of the corporation. During the same time, the corporation steadily increased its bills receivable, which, added to debts due to the corporation upon open account, showed a steady increase of assets over liabilities year by year; yet the real value of such assets was much below their nominal value, owing to the nature of the credits, as before stated. Different witnesses familiar with this paper placed their estimate of its real value ranging all the way from 30 to 50 per cent. less than its face. There is no testimony in the case showing, or tending in the remotest degree to show, that the business has not been well and economically managed. The salaries paid the officers are moderate and reasonable in amount, and, in my opinion, well earned. The proof is without contradiction that at no time since the complainant's intestate became a stockholder have the assets of the corporation been in a condition where a dividend to the stockholders could be made without serious detriment to the business of the corporation, by crippling its resources, and compelling it to discontinue business. Indeed, this fact is quite evident from the amount of capital required to carry on its business, the nature of its assets, and the amount of its liabilities.

The statute under which the corporation was organized provided that—

" If the directors of any such corporation shall declare

and pay a dividend when the corporation is insolvent, or any dividend the payment of which would render it insolvent, knowing such corporation to be insolvent, or that the payment of such dividend would render it so, the directors assenting thereto shall be jointly and severally liable, in an action founded on this statute, for all debts due from such corporation at the time of paying or declaring such dividend." [1]

In view of such liability, a court of equity should pause and ponder well before compelling a board of directors to declare and pay a dividend in a case where each individual director testifies that the corporation cannot pay a dividend without serious injury to the business of the corporation, and the president and general manager testifies that such a step would have injured their business so that they would have had to wind it up. The statute also provides that the stock, property, affairs, and business of every such corporation shall be managed by its directors.

It is a well-recognized principle of law that the directors of a corporation, and they alone, have the power to declare a dividend of the earnings of the corporation, and to determine its amount. 5 Amer. & Eng. Enc. Law, 725. Courts of equity will not interfere in the management of the directors unless it is clearly made to appear that they are guilty of fraud or misappropriation of the corporate funds, or refuse to declare a dividend when the corporation has a surplus of net profits which it can, without detriment to its business, divide among its stockholders, and when a refusal to do so would amount to such an abuse of discretion as would constitute a fraud, or breach of that good faith which they are bound to exercise towards the stockholders. Such is not the case here. The directors themselves own the largest share of the stock, and testify that they are anx-

---

[1] See How. Stat. § 4149.

ious to receive a dividend whenever it can be made with- out injury to the business. They have not diverted nor misapplied the funds of the corporation. They have exercised the best of faith towards the stockholders. The books of the corporation show judicious management, and that a surplus of net earnings had accrued from year to year to and including the year 1887, which may be considered "net profits," which term has been defined to be what shall remain as the clear gains in any business venture after deducting the capital invested in the business, the expenses incurred in its conduct, and the losses sustained in its prosecution. *Park v. Locomotive Works*, 40 N. J. Eq. 114 (3 Atl. Rep. 162). By referring to the balance-sheet at the close of the business December 12, 1887, it will be seen that the capital invested in the business was:

| | |
|---|---:|
| Real estate | $27,869 42* |
| Tools and machinery | 21,160 50 |
| Merchandise | 41,783 54 |
| | $90,813 46 |
| Bills payable | $56,917 07 |
| Accounts payable | 24,089 84 |
| | $81,006 91 |

The items of the account under the head of "Real Estate," "Tools," etc., and "Merchandise," are not available for the payment of dividends, and may be set aside as so much capital invested in the plant and product. The resources out of which profits may be expected to arise at that date will have to be scaled down to actual value as shown by the testimony, and perhaps the lowest estimate placed upon them by the witnesses should be adopted, if we are to sit in judgment upon the discretion exercised by the directors in the management of the business. The lowest estimate of the value of the bills receiv-

able and accounts receivable is 50 per cent. of their face value. The face value, as shown by the balance-sheet of December 12, 1887, is as follows:

| | |
|---|---:|
| Bills receivable | $173,616 16 |
| Accounts receivable | 87,179 90 |
| Total face value | $260,796 06 |
| Fifty per cent. of this is | $130,398 03 |
| Add cash in bank and safe is | 2,396 05 |
| | $132,794 08 |

If from this sum we deduct the bills and accounts payable as above stated, there remains $51,787.17 as net profit. Now, since in this calculation all the liabilities have been provided for, and all losses likely to arise from the conversion of the notes and accounts into money have been eliminated, and as the corporation has on hand merchandise of the value of $41,783.54, which consists of unsold manufactured articles, and raw material on hand to be used in manufacturing, it may be asked, why may not the whole or a considerable part of this net profit be appropriated to the payment of dividends to stockholders? The answer is that it would deprive the corporation of the means from which to carry on its business. If this class of assets could be converted into money, and the debts and liabilities of the corporation paid, it would leave a working capital in the hands of the directors of $51,787.17. This sum is insufficient to carry forward the business. The balance-sheets from the books show that about $20,000, on an average, is paid out for merchandise, which, in this instance, is the raw material, wood, and iron, etc., used in manufacture. The expense account, as contained in the balance-sheet of December 12, 1887, shows that the operating and other expenses of 1887 were $56,765.26, making a total of $76,765.26 required to carry on the business a year. This shows that the $51,787.17

could not be drawn out from the business and divided without disaster, and compelling a winding up of the corporation. It is true that the directors would have on hand merchandise of the value of $41,783.54, consisting of manufactured articles and material for manufacture, but this could not be made available as a means to carry on the business, for the expense of manufacture must be met at once, and the necessities of the business require that sales of manufactured goods shall be made upon three and four years' time, and the directors could derive no available means from this source to meet the necessary and current expenses of the business, and the result would be the utter inability of the corporation to continue business. Indeed, this is apparent from the fact that as the business is now conducted, with the notes maturing, the corporation is obliged to borrow money and obtain credit in open account to the amount of $81,006.91, as shown by the statement of December 12, 1887, for that year. And this is about an average for several years previous. It is evident that no dividend can be paid without borrowing the money for that purpose, and no court of equity will compel a board of directors, against their judgment and wishes, to borrow money to pay dividends.

The item in the trial balance called "Surplus Fund" is not an asset, but what is not fictitious is a liability, if anything. It is composed first of a fictitious entry of $40,000, supposed to represent premium on the stock. The balance is made up of the difference between the inventory of merchandise and the "Expense Account," which is called "net gain," and carried into the capital stock account as "Surplus Fund." If it represents capital stock, it is a liability equivalent to a stock dividend of that amount to be divided *pro rata*. It does not, however, represent a real asset, and is not carried into

the financial statement of "Resources" and "Liabilities." The merchandise inventoried became converted into bills and accounts receivable, and these in turn are used in payment of liabilities. So that, in estimating the standing of the corporation, this "Surplus Fund" account must be entirely omitted. This "Suspense Account" as kept is a fictitious account. It was opened for convenience, and was designed to represent losses upon debts due the corporation, estimated at 10 per cent. of all such debts. The testimony shows that this estimate was too small, and that such losses equaled or exceeded 30 per cent.

For reasons stated above and in the opinion of the circuit judge, I am of opinion that the decree should be affirmed, with the costs of this Court.

GRANT and LONG, JJ., concurred with CHAMPLIN, C. J.

MORSE, J., (dissenting). William H. Lothrop, the husband of the complainant, in March, 1881, then in the employ of Roberts, Throp & Co., a corporation organized and existing under the laws of this State, purchased 240 shares of stock in said corporation, of the face value of $6,000, and of the actual value of $9,000, which last-named sum he paid for said stock. He continued in the employ of said corporation until November 27, 1882, when he died. The business of the corporation is located at Three Rivers, where Lothrop resided at the time of his death. Lothrop left surviving him his widow, the complainant, since remarried, and two children, now aged 12 and 15 years respectively, and residing with their mother.

When Lothrop died, the principal part of his estate consisted of this stock. Inventorying this stock at $9,000, his estate was appraised at $14,110.40, $229.10 of which was household furniture, and consisted entirely of per-

sonal property. There were $4,180.85 of debts proved against his estate. Up. to the present time the widow has been unable to sell this stock at its cost. No dividend has ever been declared upon it. The debts are unpaid and drawing interest, and she has been obliged to increase her indebtedness in order to support herself and her children.

She filed the bill in this cause in December, 1887, as administratrix of the estate of Lothrop, praying that the circuit court in chancery for the county of St. Joseph inquire into and ascertain what amount of the surplus profits and earnings of said corporation are now on hand under the control of said corporation; and that the persons acting as its managers and directors (who are also made parties defendant with the corporation) be required to account and make showing of all the moneys and property of said corporation now held and owned by it; and that it be decreed that the directors of said corporation be ordered and required to pay on the stock of said corporation held by her as such administratrix, and the other stockholders thereof respectively, such dividend as to the court might seem proper.

The undisputed facts as to the existence and management of this corporation show a peculiar state of things, to say the least. The corporation was organized in 1875, for the purpose of manufacturing and selling agricultural implements, and the period of its corporate existence was fixed at 30 years. The capital stock was fixed at $250,000, and consisted of 10,000 shares, at $25 each. The full amount of stock subscribed for was $80,000, all of which has been paid up. No certificates have ever been issued for a greater amount than $80,000. The stock was at first owned entirely by two families, Roberts and Throp. In 1881, Throp and his sons, who owned half, sold out to Roberts. At this time all the surplus

profits and accumulations were taken out and divided among the stockholders, but it was considered after this was done that the stock was worth $1.50 upon the dollar, and Roberts paid the Throp family $60,000 for their $40,000 of stock.   He then sold some of the stock to other parties, at the same value at which he purchased it, Lothrop paying $9,000 for $6,000 of stock at face value.   The stockholders, as shown by the annual report filed January 28, 1888, outside of the Roberts family were:  Joseph W. French, 400 shares; C. L. Blood, 280 shares; William H. Lothrop estate, 240 shares; C. Schafer, 43 shares; and M. H. Bumphrey, 25 shares.   The directors December 31, 1881, were Cyrus Roberts, George A. Roberts, Samuel H. Roberts, James B. Roberts, Horace Roberts, and Joseph W. French.

The by-laws provide that there shall be elected for the first year six directors, who shall be chosen annually, according to law, on the second Tuesday in December in each year.   There has never been a meeting of the stockholders, as appears by the records of the company, since March 26, 1881.   There is in the records a meeting headed "Special Directors' Meeting," held November 14, 1887, which was called to order by Cyrus Roberts, president.

"Present:  Cyrus Roberts, George A. Roberts, James B. Roberts, J. W. French.

"Minutes read and approved.  Moved by J. W. French, and seconded by James B. Roberts, that we proceed to a formal ballot for director to fill vacancy.  George A. Roberts acted as teller, and announced four ballots as having been cast, of which C. L. Blood received four ballots, and was announced as unanimously elected.

"Moved by J. W. French, and seconded by James B. Roberts, that we do now adjourn.  Carried.

"M. H. BUMPHREY, Secretary."

The secretary, Bumphrey, testifies that there was a stockholders' meeting on December 13, 1887, but there is

no evidence that any one was notified or attended except the directors and secretary. This was after the filing of the bill in this cause. The directors elected in 1881 have held over and managed the corporation ever since the first election, in March, 1881, and it seems to have been managed principally in the interest of the Roberts family. Cyrus Roberts is president; salary, $800. One of his sons is treasurer; salary, $1,000. Another is foreman of the shops, at $15 per week. Bumphrey is secretary, at $1,000 per year. French and Blood are now directors, leaving the complainant and Schafer, who has 43 shares, the only stockholders left out of active participation in the management of the corporation. The by-laws also prescribe that the directors shall meet on the first Monday evening of every month. There has never been a regular meeting of the directors since their election. They held four special meetings in 1881, March 26, March 28, May 26, and December 19; one April 6, 1882, July 29, 1885, and November 14, 1887, at which last meeting a director was elected to fill vacancy without authority to do so.

The annual statements filed by the directors or a majority of them in each year show as follows:

### Year ending December 31, 1881:

| | |
|---|---|
| Capital stock paid in | $80,000 00 |
| Liabilities | 39,613 55 |

### 1882:

| | |
|---|---|
| Capital stock paid in | 80,000 00 |
| Liabilities | 74,056 40 |

### 1883:

| | |
|---|---|
| Capital stock paid in | 80,000 00 |
| Liabilities | 59,787 65 |

### 1884:

| | |
|---|---|
| Capital stock paid in | 80,000 00 |
| Liabilities | 71,962 45 |

### 1885:

| | |
|---|---|
| Capital stock paid in | $80,000 00 |
| Invested in real estate | 26,875 15 |
| Personal estate | 56,111 46 |
| Debts | 93,825 12 |
| Credits | 235,285 43 |

### 1886:

| | |
|---|---|
| Capital stock paid in | 80,000 00 |
| Invested in real estate | 27,231 99 |
| Personal estate | 62,427 96 |
| Debts | 108,032 81 |
| Credits | 263,780 96 |

### 1887:

| | |
|---|---|
| Capital stock paid in | 80,000 00 |
| Invested in real estate | 27,869 42 |
| Personal estate | 62,964 36 |
| Debts | 81,006 91 |
| Credits | 263,171 79 |

### 1888:

| | |
|---|---|
| Capital stock paid in | 80,000 00 |
| Real estate | 28,532 74 |
| Personal estate | 56,444 21 |
| Debts | 51,623 18 |
| Credits | 191,651 16 |

The last report was made January 25, 1889, about a year after this suit was commenced. All these reports except the last are sworn to as true by either the secretary or treasurer, except 1885, 1886, and 1887, which are sworn to by the secretary, Bumphrey, to be "true and correct, to the best of my knowledge and belief." The last one does not appear to be sworn to at all, but this may be a mistake of the record, as it does not appear to be signed by any one. These statements, which ought to be presumed to be true, show that at the close of the year 1887, about the time this bill was filed, this corporation had, in excess of its capital stock, real and personal property to the amount of over $10,000, and credits exceeding its indebtedness in the sum of $182,164.88; and

yet it is not able to declare a dividend. But this is not all. We have in the record the balance-sheets of the corporation at the close of business from the year 1881 to 1888, inclusive. It starts in 1881 with a capital stock of $80,000, and $40,000 surplus. This surplus is supposed to represent the added value of the shares when Roberts bought out the stock of the Throp family, and may or may not amount to anything. It is claimed by the defendants that this only represents an estimated value which may be fictitious, but complainant contends that it is real and substantial, and represents in fact so much value. The net gain figured for that year was $17,744.46, which, added to the capital and surplus, made a basis of $137,744.46 net capital for the year 1882. The net gain for that year was $50,352.59, which started 1883 with a net capital of $188,097.05. The net gain for 1883 was $28,249.02, making net capital for 1884 $202,726.69, as shown in the report. In 1883 appears for the first time an item called "Suspense Account," of $13,619.38, which seems to have reduced the net capital to the figures given above. The net gain for 1884 was $20,728.39; starting 1885 with a net capital of $223,455.08, the suspense account remaining the same as in 1883. In 1885 the net gain was $11,317.12. Net capital for 1886, $224,446.92; suspense account increasing to $23,944.66. In 1886 net gain $20,961.18. Net capital for 1887, $245,408.10. Suspense account same as 1885. In 1887 net gain $3,645.90. Net capital for 1888, $249,054. Suspense account same as 1885. In 1888, in the report filed after the commencement of this suit, we find the first loss. Net loss $47,-993.73; leaving net capital for 1889, $201,060.27. Suspense account, $23,944.66. One of the directors accounts for this loss in his testimony. It was made up of losses in Texas upon corn-shellers for the years 1886 and 1887, and not charged until 1888, and of notes before that

time, classed as "bills receivable," and which were considered worthless and charged off as loss in 1888. The suspense account was attempted to be explained by some of the officers of the defendant, but the explanation was not very clear. The counsel for the complainant claim that it is an asset instead of a liability, which would increase the surplus of the company over and above its debts and capital stock double the amount of such account, to wit, $47,889.32. The explanation of the secretary of the corporation as to this suspense account is as follows:

"There is the suspense account. It was ten per cent. net gain in 1881 on collections, $1,774.44; ten per cent. net gain 1881, machinery and inventory, $1,774.44. Then in 1885 there was ten per cent. of the 1882 collections charged over, $5,035.25. It was not charged off the books, but held in suspense. Ten per cent. net gain of 1882, machinery and inventory, $5,035.25; ten per cent., 1883, collections, $2,824.90; ten per cent., 1883, machinery and inventory, $2,824.90; ten per cent., 1884, collections, $2,072.83; ten per cent., 1884, machinery and inventory, $2,072.83. Then there was $529.82, when I footed up to carry forward; that was an error that was not discovered until the report was entered. Instead of crediting back, I charged it, and it made the trial balance all right.

"Q. How much was this suspense account?

"A. It was $23,944.66.      *      *      *      *      *      *

"Q. I want to ask a little more about the suspense account. The suspense account by the figuring you have made there is charged as a liability?

"A. No, sir; not at all.

"Q. It is so much money deducted from the surplus?

"A. Yes, sir; but it stands as a separate account.

"Q. I understand it is a sort of sinking fund?

"A. No, sir; not at all. It would be a fund on the other side.

"Q. You have gone through and charged up ten per cent.?

"A. No, sir; not by any means. It was simply an estimate ordered by the board of directors. We did not

83 MICH.—6.

go through and take any special account, but simply took ten per cent. of the net gain in those years included in the surplus, and held it as a suspense account.

"*Q.* That was held to cover any possible contingencies?

"*A.* Yes, sir; if we had losses.

"*Q.* And if you had no losses, it would be so much more money?

"*A.* Certainly.

"*Q.* So that account is held in suspense?

"*A.* Yes, sir.

"*Q.* In other words, you had that, so as to be on the safe side?

"*A.* I think it is a business principle that is generally exercised.

"*Q.* It was really an account set aside on your books?

"*A.* Yes, sir.

"*Q.* To cover any losses?

"*A.* Yes, sir.

"*Q.* Then, if you have no losses, it would not be taken out?

"*A.* Certainly not. You are right."

He further testified that the suspense account was simply a percentage charged up as a precaution against loss. As near as I can ascertain, this suspense account is on the right side of the column as to debits and credits, as it is charged upon the books of the corporation. It is treated as a liability, but it may not be one. The corporation has had credit for this amount in its bills receivable and inventory of property. This suspense account is 10 per cent. of the net gain of each year, charged over to the debtor side, to meet anticipated or estimated losses on such net gain as now credited on the books. If they have that amount of losses, then the balance remains as it is now; if not, this $23,944.66, or so much thereof as is not used to meet losses, is to be added to the balance as it now stands. It it not doubled when it goes back, as complainant's counsel claim. It really has never been taken out of the assets. In theory

it has been by charging it as a debt, but even in theory it has been deducted from the credit side but once. This has been done by charging it to the debtor side of the ledger, while it still remains on the credit side among the other assets. If paid out for losses, the balance will not be disturbed on the books, unless it is charged upon the debit side again as it is paid out, and the real balance will be as now shown on the books. But I shall consider the case independently of this suspense account.

When this bill was filed, or at the end of the corporate year for 1887, the net capital of this corporation appeared by the sworn statement of its officers to be $249,054. Its real estate and personal property on hand amounted to $90,833.78, or $10,833.78 more than the capital stock paid in. Its credits exceeded its debts $182,164.88. Add to this the excess of property over capital stock, and we have $192,998.66. Now deduct from the net capital, $249,054, the capital paid in, $80,000, and we have left $169,054. Add to this the suspense account of $23,944.66 and we have again the $192,998.66 Now give the defendant corporation the benefit of the suspense account, and we still find it after its capital stock of $80,000 and all its liabilities are paid, suspense account included, with a clear surplus of $169,054, in property and credits. But it is claimed by the defendants' counsel that $40,000 of this surplus is fictitious, and never had any existence in fact. If we grant this, we still find a surplus of $129,054, earned in seven years, or an average of $18,436 per year. This $40,000 surplus arose in this way: From the organization of the corporation in 1875 up to 1881, when Roberts purchased the interest of Throp, it is admitted that large profits were made in the business. So great were these profits that Roberts, Sr., testifies that when he and Throp divided up, each taking one-half of the money and notes that belonged to the corporation, there was over

$100,000 in notes, $50,000 each. The amount of money drawn out does not appear, but in one place he says that each drew out the money they put it, to wit, $15,000 each. He claims that he lost $15,000 on his share of the notes, but that left him $35,000 on the note account. After they had thus divided up the moneys and notes belonging to the corporation, there was still left the plant. They valued this, and the machinery, lumber, iron, and machines on hand, when the company was first started, at $50,000, and then put in $30,000 in cash, $15,000 each, thus making the capital stock paid in $80,000. There was $7,000 or $8,000 worth of improvements made in the plant before 1881. They estimated between themselves, in 1881, the plant, machinery, and personal property on hand, after taking out the moneys and notes, with the good will of the business, to be worth $120,000, and Roberts thereupon paid Throp $60,000 for his half of the capital stock. A dollar of the stock was then supposed to be really worth a dollar and a half, and it was at these figures that Roberts, after he had acquired all the stock, sold some of it to other parties, including the stock purchased by Lothrop, who gave $9,000 for $6,000 of stock. Now it is claimed that the plant and property was not worth any more than $80,000. In other words, the $40,000 that was credited up to surplus, showing the real capital to be $120,000, and upon which showing Roberts sold this stock to Lothrop and others, was a fictitious sum, and never existed in fact, although it has been carried as a surplus ever since. But, if this is so, still every dollar of the stock is now worth about $2\frac{1}{8}$ dollars, according to the sworn statements of the company, if the credits are worth their face value. It is not claimed that the real estate and personal property is inventoried above its actual value.

The first objection against the granting of a decree in

favor of the complainant is a technical one. It is said she has never applied to the board of directors when they were in session asking them to declare a dividend, and that application to single directors separately is not sufficient under the authorities. But it is shown by the proofs that the complainant has, by herself and through duly-authorized agents, applied to several of the directors, and those the managing ones of the corporation, to declare a dividend, and they have refused to do so, and all of them swear that they would not have declared a dividend if she had applied to the board when it was in session. When we consider that there has never been a regular meeting of the directors, and but a few meetings at all, that there never has been a meeting of the stockholders except after her bill was filed, that she had no notice of this meeting, or of any meeting of the directors, that the directors own almost the whole of the stock, and can control a stockholders' meeting as easily and fully as they can a meeting of their own board, it is manifest that any action that she might have taken before a stockholders' or directors' meeting would have been futile and useless. Under such circumstances, equity does not require that she should go to the expense of any such action. "The law does not require an idle ceremony to ground an actionable right." *Donkersley v. Levy*, 38 Mich. 57.

It is clear to me that there has been an object in the whole course and proceeding of this corporation. There has been an evident design to "freeze out" this small stockholder, the complainant, and she, a woman, presumably not well acquainted with her rights, nor with the strength and purpose that a man would have to assert and enforce them. This is shown by their non-compliance with the law as to both directors' and stockholders' meetings; in keeping one set of directors in, in violation of law, and calling no meeting of stockholders to elect their

successors as their times expired; in paying no attention whatever to her rights as a stockholder under the law, treating her the same as they would an entire stranger to the transaction; in advising her to sell her stock, and offering her the munificent (?) sum of the face value of it, $6,000, with interest at 6 or 7 per cent., when her husband paid $9,000 for it.  In fact, the corporation has been run in the interest of the Roberts family at the expense of this poor woman, and the directors gravely inform the court, in substance, that they must continue to so manage it or bring ruin upon the corporation.  There is and can be no excuse for this conduct.  Nor does it avail these directors that they "are men of high standing as business men, and of unquestioned integrity," as found by the circuit judge.  The facts in this case must govern this record, and justice and equity prevail, notwithstanding the high character of the board of directors as individuals.  It is plain that the usual object of a corporation is not to accumulate profits, and add them to the capital stock, but to make and divide each year, if possible, profits as dividends equally among the shareholders. If profits are made, the amount to be declared as a dividend is within the reasonable discretion of the directors, but it is admitted by the circuit judge, who dismissed complainant's bill, that—

"There can be such a condition of things as will justify a court of equity in compelling directors to declare a dividend contrary to their judgment."

The directors of a corporation have a discretionary power to a limited extent to accumulate the profits of the company, but they cannot go on accumulating them indefinitely.  After a reasonable limit has been reached, every shareholder has a right to insist that they shall be distributed as dividends.  1 Mor. Priv. Corp. § 452.  And the courts have a right to interfere in behalf of the

stockholder, and order a dividend, when it is clear either that the directors have acted in bad faith or from a mistaken view of their legal duties. Id. § 460.

The question to be here decided is, was it the duty of the directors at any time to declare a dividend, and have they wrongfully refused to distribute the profits, or any part thereof? If so, the complainant is entitled to relief. It must be remembered that the record shows that this corporation was first organized on the basis of a capital stock of $250,000, but only $80,000 has ever been issued. The net capital when this bill was filed had been increased by the showing of the company upon its books to $249,-054. Deducting the $40,000 (said to be speculative only, but of which complainant's husband paid his *pro rata* share, $3,000, when he bought his stock), and we have, in round numbers, $209,000. For this accumulation of profits or capital no stock dividends have been issued, or no new shares created. It has been simply left in the business, to be controled and managed by the directors. As far as her stock is concerned, the complainant has nothing to show for this increase, and it seems that in the estimation of the directors, or some of them, who made her offers, or put a value upon it to her attorney, her stock is not worth any more than it was before this increase, if it is worth as much.

We will now consider the excuse offered for not declaring any dividends. It seems that, when Throp sold out to Roberts, it was no serious detriment to the business to take out of it every dollar in money and all the notes, the latter amounting to over $100,000. The corporation was then thought to be worth after this stripping $120,000, one-half more than when it started, and upon that idea Lothrop bought his stock. By borrowing $1,000 the business was started anew the very next day after Roberts bought out Throp, and has flour-

ished ever since, doing, according to one of the directors, the best and most profitable business it ever did in the years 1882, 1883, and 1884. Still, in the face of these facts as to the effect of this enormous division of profits in 1881 among the stockholders, then composed of the Roberts and Throp families, and their complete withdrawal from the business, it is now claimed and given in evidence by the directors that there has never been a day since when any dividend could be declared without serious detriment to the corporation, although in three years at least since that time the business has been more profitable than ever before. And yet the character of the business has not been materially changed. It is only claimed that it has been enlarged. The defendants' counsel admit the apparent net capital of $209,000 in 1887, but say that $173,000 of this represents notes taken for machines sold, called in the statements "bills receivable." They further say that it does not represent correctly the actual condition of the company for the following reasons:

"1. All the apparent surplus capital is tied up in bills receivable, taken in exchange for machines sold, and as such is subject to heavy shrinkage, not worth fifty cents on the dollar, very hard to collect.

"2. The other property of said corporation is invested in material, plant, fixtures, and machinery used in the business, and all subject to wear and tear, etc.

"3. For the reason that there were heavy losses which accrued in that and former years, amounting in the aggregate to $47,000, which had been carried forward with a hope of realizing something out of it, and was finally abandoned and charged off in 1888.

"4. While there may be nominal, there are not any actual, profits, and no one can tell whether there will be or not until the company's paper is collected, and the debts paid. There seems to be a surplus of unavailable assets, but an actual deficiency of money or anything that can be turned into money."

During these years the statements show that in 1885 there was due, at the end of the year, from the First National Bank,—

|  |  |  |
|---|---|---|
|  | $16,864 | 55 |
| Cash on hand in safe | 529 | 82 |
| Total | $17,394 | 37 |

### In 1886:

|  |  |  |
|---|---|---|
| Bank | $12,777 | 90 |
| Safe | 164 | 75 |
| Total | $12,942 | 65 |

### In 1887:

|  |  |  |
|---|---|---|
| In bank | $2,375 | 73 |
| Safe | 20 | 32 |
| Total | $2,396 | 05 |

### In 1888:

|  |  |  |
|---|---|---|
| In bank | $290 | 55 |
| Safe | 10 | 06 |
| Total | $300 | 61 |

The statement in 1888 was made while this suit was in progress. Before 1885 there seems to be no account of money in bank, but each year there is shown a large amount of bills and accounts receivable. There was cash enough on hand in 1885 and 1886 to have made a very reasonable dividend upon the face value of the stock. There seems to have been no difficulty in collecting these bills receivable, so that the business was enlarged and kept in a flourishing condition. It is not to be presumed that they have allowed any of the notes to outlaw, and when the losses were charged off, after this suit was commenced, they amounted to only $47,000, and a large part of this was not from bills receivable, but the loss of goods in the Texas speculation upon corn-shellers. There is no doubt but there has been actual profits; and, even,

conceding that the bills receivable, or time notes, will not realize any more than they did when Throp and Roberts divided up, they are still worth 70 cents on the dollar; and it must be remembered that the bills receivable on hand in 1888, after all losses are charged off, amount to over $150,000. Besides this, there are over $40,000 of accounts receivable, and over $80,000 of real estate, machinery, and merchandise on hand. The debts are $51,623.18, and the capital stock, $80,000. There is no reason why a dividend cannot be declared.

All the stockholders except this woman, and one other person, who has only 43 shares, are directors of the corporation or members of the Roberts family, with the exception of Bumphrey, the secretary, who holds 25 shares, and has been an active supporter of the past action of the company. If these men honestly think they cannot withdraw the amount of the dividends upon their stock without detriment or danger to the corporation, they can take the same in stock, and leave the money in the business. But the claim that the complainant cannot be given her proper dividend without damaging or deranging the financial condition of the corporation is nonsense. It is evident that these directors have not exercised a proper and reasonable discretion in this matter, and it is also apparent that they do not intend for some time to come, if ever, to declare any dividend. No hope is held out anywhere in their testimony that they can declare any in the future. But it is evident to my mind that they could have done so before this time from their own financial showing, and that the complainant is now entitled to one. If equity is powerless to protect this woman in her rights, then the directors of a corporation can do about as they please with the property which they have heretofore been supposed to hold as trustees for the stockholders, and the small stockholder

is entirely at the mercy of the larger ones, who always control the management, and there is no relief. This is not equity, but oppression, sanctioned under and by the *forms* of the law.

The decree below ought to be reversed.

CAHILL, J. I agree with Mr. Justice MORSE in the result reached in this case. I find nothing in the record to justify the conclusion that a dividend cannot be declared on the stock without crippling the business of the corporation. The concern started in 1875, with a capital of $80,000 paid in. That sum constituted its entire resources, and with that sum it was able to start and carry on a successful business, so that in 1881 they were able to divide a handsome surplus among the stockholders without impairing the capital. In 1881 the concern again started out, and the record shows that from comparatively small beginnings the business has grown to great proportions. It may be that the corporation cannot reach out as fast and as far as its managers may wish in the way of extending and enlarging its business, and at the same time pay dividends to stockholders; but that it can carry on a business successfully to the extent it was doing when complainant's husband purchased his stock is substantially demonstrated by experience. I think complainant is entitled to a dividend.