SENIOR INVESTMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 104631.   Promulgated June 15, 1943.

*R. M. O'Hara, Esq.,* and *Benjamin E. Jaffe, Esq.,* for the petitioner.
*Philip M. Clark, Esq.,* for the respondent.

134

[redacted]

OPINION.

TYSON, *Judge:* One of the issues presented by the petition filed herein is whether, in computing surtax on undistributed profits for each of the years 1936 and 1937, the petitioner should be allowed for each of such years, under the provisions of section 26 (c) (1) of the Revenue Act of 1936, a credit of an amount equal to its entire adjusted net income. While the proceeding was under advisement, Congress amended section 26 (c), effective as of the date of the enactment of the Act of 1936, by adding paragraph (3) which authorizes a credit in the case of a deficit corporation. Sec. 501 (a) (2), Revenue Act of 1942. Section 26 (c), as thus amended is set forth in the margin.[1]

---

[1] SEC. 26. CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\* \* \* \* \* \* \*

(c) RESTRICTIONS ON PAYMENT OF DIVIDENDS.—

(1) PROHIBITION ON PAYMENT OF DIVIDENDS.—An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. \* \* \*

\* \* \* \* \* \* \*

(3) DEFICIT CORPORATIONS.—In the case of a corporation having a deficit in accumulated earnings and profits as of the close of the preceding taxable year, the amount of such

Because of the change in the applicable law, we entered an order on January 16, 1943, directing the parties to file supplemental briefs on the question of the effect of section 501 (a) (2) of the Act of 1942 upon the petitioner's claim for credit. Such supplemental briefs have been filed and the question for determination is whether a credit is allowable either under section 26 (c) (1) or section 26 (c) (3), *supra.*

*Is a credit allowable under section 26 (c) (1)?* The facts reveal a prohibition against the payment of dividends contained in the charter of the petitioner as amended on August 29, 1933, and also in the amended stock certificates through the endorsement thereon of a reference to the changes effected by the charter amendment. That prohibition was effective until such time as the petitioner's earnings and profits to the extent of $6,444,239.86 should be transferred to capital or capital surplus or surplus, and, as the petitioner's earnings and profits up to the close of the year 1937 fell far short of that amount, the restriction upon the payment of dividends remained in force during the taxable years 1936 and 1937.

The petitioner contends that, under the authority of *Lehigh Structural Steel Co.* v. *Commissioner*, 127 Fed. (2d) 67, the charter amendment and the amended stock certificates must be considered "a written contract executed by the corporation" within the meaning of section 26 (c) (1). The Circuit Court of Appeals for the Third Circuit in that case held that stock certificates issued by a corporation meet the statutory test and it said that it found nothing in the opinion of the Supreme Court in *Helvering* v. *Northwest Steel Rolling Mills, Inc.*, 311 U. S. 46, which supports the argument that neither a charter nor a certificate of stock can ever be the kind of "written contract" which is meant by section 26 (c) (1). This interpretation of the statute and of the language used by the Supreme Court in the *Northwest Steel Rolling Mills* case has been rejected by the Circuit Court of Appeals for the Sixth Circuit, *Warren Telephone Co.* v. *Commissioner*, 128 Fed. (2d) 503; certiorari denied, 317 U. S. 697; *Metal Specialty Co.* v. *Commissioner*, 128 Fed. (2d) 259; *Bishop & Babcock Manufacturing Co.* v. *Commissioner*, 133 Fed. (2d) 199; and by the Circuit Courts of Appeals for the First and Seventh Circuits, *Elliott Addressing Machine Co.* v. *Commissioner*, 131 Fed. (2d) 700; *Central West Coal Co.* v. *Commissioner*, 132 Fed. (2d) 190; certiorari denied, 318 U. S. 778; and, upon the authority of those cases and our previous decisions in *Lehigh Structural Steel Co.*, 44 B. T. A. 422; *Bishop & Babcock Manufactur-*

deficit, if the corporation is prohibited by a provision of a law or of an order of a public regulatory body from paying dividends during the existence of a deficit in accumulated earnings and profits, and if each provision was in effect prior to May 1, 1936.

(4) DOUBLE CREDIT NOT ALLOWED.—If more than one of the credits provided in the foregoing paragraphs (1), (2), and (3) apply, then the paragraph which allows the greatest credit shall be applied; and, if the credit allowable under each paragraph is the same, only one of such paragraphs shall be applied.

*ing Co.*, 45 B. T. A. 776; *Budd Wheel Co.*, 45 B. T. A. 963; and *McLean County Service Co.*, 45 B. T. A. 1004, we hold that the petitioner is not entitled to credit under section 26 (c) (1).

However, the petitioner does not rely alone upon the provisions of the charter amendment and the stock certificates to bring its case within the requirements of section 26 (c) (1), *supra*. It argues that, independently of such documents or taken in connection therewith, the reorganization agreement executed by the petitioner, its stockholders, and the Senior Corporation on August 23, 1933, meets those requirements, and that we must look to all of the documents which were before the parties at the time of its execution and to those documents which were executed pursuant thereto—including the memorandum of counsel, the resolutions adopted by the directors and stockholders, the amendment to the petitioner's articles, and the certificate of incorporation of the Senior Corporation—in determining the whole contract executed by the petitioner, and that we must read the provisions of such documents as if they were set out in detail in the reorganization agreement itself. It is true that the reorganization agreement required the fixation of the rights, powers, privileges, limitations, and restrictions respecting each class of stock of the petitioner and the Senior Corporation so as not to affect the rights, powers, privileges, limitations, and restrictions which the holders of each class of stock in petitioner had in its assets before the consummation of the transaction; and it may also be true that because of such requirement the parties regarded it as essential to the effectuation of such purpose that restrictions be placed upon the power of each corporation to pay dividends until such time as the deficit allocated to each should have been restored from its earnings. Assuming that the reorganization agreement, under these circumstances, may be said to deal "expressly   *   *   *   with the payment of dividends" (*Gehring Publishing Co.*, 1 T. C. 345), it nevertheless did not operate as a contract restriction upon the dividend powers of the petitioner. The agreement merely required the adoption of charter provisions by petitioner defining the various rights of and restrictions upon each class of its stock. This is manifest from the memorandum of counsel which states that the amended charter of the petitioner should provide that the earnings be transferred to capital until the deficit of $6,444,239.86 had been restored and that no dividends might be paid on the class A stock until such sum had been restored to capital. Upon the filing of the amended articles of the petitioner and of the charter of the new corporation and the exchange of assets for stock the reorganization agreement was discharged by a performance in accordance with its terms. It is therefore clear that after full performance and discharge of the agreement the only contracts which remained in force and which could operate to restrict

the payment of dividends by petitioner were the petitioner's amended charter and its amended modified stock certificates, which had superseded the agreement in that respect, cf. *Elliott Addressing Machine Co.* v. *Commissioner, supra;* and, as we have held, the amended charter and the stock certificates are not such contracts as are within the intendment of section 26 (c) (1). The respondent's action in disallowing the credits claimed under that section is approved.

*Is credit allowable under section 26 (c) (3)?* The petitioner contends that at December 31, 1935, and at December 31, 1936, it had a deficit in accumulated earnings and profits in excess of its adjusted net income for the succeeding calendar year, and that, by provisions of the General Corporation Act of Michigan, hereinafter mentioned, it was prohibited from paying dividends during the existence of such deficit. The respondent's position is (1) that in reality the petitioner had no deficit in accumulated earnings and profits at those dates, and (2), assuming that it did, the petitioner was not prohibited by the Michigan law from distributing its net earnings of the taxable years.

On June 30, 1933, the petitioner had a deficit, as disclosed by its books, of $21,041,234.12, and in the reorganization $14,596,994.26 of this deficit was assumed by the Senior Corporation and $6,444,239.86 was retained by the petitioner. It is the rule that, where the assets of one corporation pass to a successor corporation in a tax-free reorganization, the accumulated earnings and profits of the old corporation pass to the successor with the same status and are available for the payment of dividends by the latter, *Commissioner* v. *Sansome*, 60 Fed. (2d) 931; certiorari denied, 287 U. S. 667; *United States* v. *Kauffmann*, 62 Fed. (2d) 1045; *Reed Drug Co.* v. *Commissioner*, 130 Fed. (2d) 288; *Helen V. Crocker*, 29 B. T. A. 773; and that, where only part of the assets are so transferred, it is proper to make an allocation of the earnings and profits between the two corporations in proportion to the assets transferred and the assets retained. *Barnes* v. *United States*, 22 Fed. Supp. 282; *Estate of Howard H. McClintic*, 47 B. T. A. 188, 202.

The respondent questions the petitioner's claim that it is a deficit corporation; but he makes no contention that the principles of the foregoing cases do not apply to the inheritance or absorption of a deficit. He questions the deficit only in two respects. His first objection relates to the method of dividing the deficit. At the time of the reorganization the assets transferred to the Senior Corporation consisted of the Fisher stock of the market value of $8,000,000 and other assets of the market value of $12,838,325.63. The remainder of the petitioner's assets which it retained had a market value of $5,667,827.19. The parties agreed to divide the deficit on the basis of the

market value of the assets transferred, exclusive of the Fisher stock, and the market value of the assets retained, or in the proportion of 69.37 percent to the Senior Corporation and 30.63 percent to petitioner. At that time the deficit of $21,041,234.12 was overstated on the petitioner's books by the amount of $461,361.72. The contention of the respondent is that the exclusion of the $8,000,000 value of Fisher stock in fixing the percentages used in dividing the deficit shows that there was "no relationship between the division of assets and the division of the deficit" and that therefore there is "no sound basis on the theory of proportion of assets transferred and retained for computing the division of the deficit in accordance with those identical percentages;" and, with respect to the overstatement of $461,361.72, he states that such overstatement leaves "no rational basis for the precise amount of the deficit."

The exclusion of the Fisher stock in fixing the percentage for dividing the deficit was adopted by the parties, as the findings of fact show, in order to preserve the existing rights of the holders of the various classes of stock of the petitioner. Whether that method was proper under the circumstances shown we need not decide. Assuming that it was not, and assuming that the division should have been made on the basis of all assets transferred (including the Fisher stock) and all assets retained in the "split-up" reorganization, so that the deficit retained would be that proportion of the total deficit which the assets retained bore to the total assets (cf. *Howard H. McClintic, supra*), a computation made along the lines suggested by the respondent's argument would nevertheless establish a deficit retained by the petitioner in an amount sufficient to give it the benefit of the credits here claimed.

The value of all of the petitioner's assets, including the Fisher stock, was $26,506,152.82, and the assets retained by the petitioner, namely, $5,667,827.19, comprised 21.4 percent of the total value. A division of the deficit on the basis of 21.4 percent to the petitioner and 78.6 percent to the Senior Corporation would result in an allocation to the petitioner of $4,502,824.10 of the deficit—an amount which, after further adjustment for the overstatement of $461,361.72, is far in excess of the petitioner's accumulated earnings and profits from June 30, 1933, to the close of the year 1937.

The respondent also attacks the June 30, 1933, deficit of $21,041,234.12 on the ground that it was computed on the basis of the book value of assets, that is, the fair market value of the petitioner's property in 1929, when it was acquired from the Fishers in exchange for capital stock. The property paid in by Fisher and his wife had a fair market value of over $88,000,000 in 1929 and it had been acquired by them prior to that time at a cost of $6,412,271.74. After retirement of part of Mrs. Fisher's stock in 1931, and at June 30, 1933, the petitioner's books disclosed assets of the book value of $63,222,862.21, current lia-

bilities of $1,320,295.33, capital stock liability of $82,943,801, and a deficit of $21,041,234.12. The respondent's position is stated in his brief (p. 57) as follows:

On the basis of cost to Fred J. Fisher and his wife, the transferors of assets to petitioner for stock on July 1, 1929, there is no foundation in the record for the existence of the deficit determined as of that date nor, in fact, for any deficit whatever. The recapitalization and reorganization of petitioner in August, 1933, [*sic*] was nontaxable. Hence, there was neither rational basis for determination of the claimed deficit in the amount stated as of June 30, 1933 nor in fact did such deficit exist.

The transfer of the property by the Fishers to the petitioner in 1929 in exchange for its capital stock was a tax-free exchange, and the taxable income of the petitioner from the disposition of such property was required to be computed on the basis of the cost of such property to the Fishers. Secs. 112 (b) (5) and 113 (a) (8), Revenue Act of 1928. However, the gain or loss reflected by the use of the transferor's basis is not the true or actual gain or loss as it affects the capital of the corporation. Whether a corporation has an earned surplus or a deficit which impairs capital is to be determined on the basis of the actual gain or loss, and the actual gain or loss is to be measured by the cost of the property to the corporation, which, in a case such as the instant one, is the fair market value of the property received in exchange for all of its capital stock. *W. S. Farish & Co.*, 38 B. T. A. 150, and authorities cited therein; affd., 104 Fed. (2d) 833. See also *F. J. Young Corporation*, 35 B. T. A. 860; affd., 103 Fed. (2d) 137; *Dorothy Whitney Elmhirst*, 41 B. T. A. 348; and *Estate of John H. Wheeler*, 1 T. C. 640.

The rule established by the above cited cases is applicable here notwithstanding the provisions of section 501 (a) of the Second Revenue Act of 1940. Although that section amends section 115 of the Internal Revenue Code so as to require the use of the adjusted basis for determining gain in the computation of earnings and profits and directs that gain or loss realized from the sale or other disposition of property by a corporation shall increase or decrease the earnings and profits to, but not beyond, the extent to which such a realized gain or loss was recognized in computing net income under the law applicable to the year in which the sale or disposition was made, and thereby supersedes the rule of the *Farish* and other cases cited above (H. Rept. 2894, 76th Cong., 3d sess., pp. 41, 42), the amendment, though retroactive as if it were a part of prior revenue acts, does not affect the tax liability of any taxpayer for any year which on September 20, 1940, was pending before the Board of Tax Appeals. Sec. 501 (c); *Estate of John H. Wheeler, supra.* The petition herein was filed on September 9, 1940, and the case has been pending since. The respondent's contention that the earnings and profits should be computed by using the cost to the petitioner's transferors is therefore without merit.

The deficit of $21,041,234.12 appearing on the petitioner's books at June 30, 1933, was computed on the basis of actual gains and losses of the petitioner from its organization up to that date. The respondent admits the accuracy of the books except for overstatement of the deficit by the amount of $461,361.72. After giving consideration to the $8,000,000 value of the Fisher stock in the division of the deficit between the petitioner and the Senior Corporation and after making allowance for the admitted overstatement, it is plain that the deficits existing at December 31, 1935, and December 31, 1936, exceeded the amount of the petitioner's adjusted net income for the years 1936 and 1937. The petitioner therefore qualifies as a deficit corporation under section 26 (c) (3), *supra.*

The petitioner relies upon the General Corporation Act of Michigan, enacted in 1931, to establish the necessary prohibition against the payment of dividends during the existence of the deficit. That act appears as Title 21, chapter 195, 15 Mich. Stats. Ann., and the sections relied upon are sections 21.22, 21.23, and 21.48 of the annotation, which are in part set forth in the margin.[2]

The respondent contends that the Michigan statute does not expressly prohibit but, on the contrary, affirmatively authorizes, the payment of dividends "either from earned surplus or from net earnings," and he argues that for this reason, since the petitioner had net earnings in each of the years 1936 and 1937, it could have distributed them without violating the statute. While section 21.22, in permissive terms, authorizes payment of dividends "either from earned surplus or from net earnings," section 21.23 prohibits their payment "except

---

[2] § 21.22  Dividends; source of payment; restrictions * * *  Sec. 22. The directors of every corporation formed or existing under this act, subject to any restrictions contained in its articles, shall have power to declare and pay dividends upon the shares of its capital stock *either from earned surplus or from net earnings.* [Italics supplied.] In determining earned surplus appreciation of value of the assets of the corporation shall not be included until realized : *Provided,* That appreciation of value shall not be construed to include any increases which result from readjustment of previous reductions of value to correctly reflect the accounts of the corporation at the time of such determination of earned surplus.  In determining what is earned surplus the judgment of the board of directors shall be conclusive unless it shall be shown that the directors acted in bad faith or were grossly negligent.

Nothing in this section contained shall prevent a corporation from declaring and paying dividends upon its preferred stock from any surplus : *Provided,* That if such dividend shall be declared and paid from any surplus other than earned surplus the shareholders receiving the same shall be advised of that fact at the time of the payment to them * * *

§ 21.23  Same; not to be paid except in accordance with act; medium of payment; * * *  Sec. 23. No corporation formed or existing under this act, nor the directors thereof, shall pay or authorize the payment of dividends upon any shares of the capital stock of the corporation except in accordance with the provisions of this act. * * *

§ 21.48  Liability for illegal dividends and distributions.  Sec. 48. The directors of a corporation shall not declare or pay dividends or authorize the withdrawal or distribution of any part of its assets except as authorized in this act * * *  In case of any wilful or negligent violation of the provisions of section twenty-two [22] or twenty-three [23] of this act or of this section, the directors * * *  shall be jointly and severally liable * * *  to the corporation for the full amount of any of such dividend, withdrawal or distribution so unlawfully paid. * * *

in accordance with provisions of this act," which means, of course, except in accordance, *inter alia*, with section 21.22. Thus there is a clear and express prohibition in the Michigan statute against the payment of dividends except out of earned surplus or net earnings.[3]

The respondent contends further in effect that, even though the statute expressly prohibits the payment of dividends, the term "net earnings" is used therein in the sense of current or annual net earnings, and that petitioner, having earnings in each of the years 1936 and 1937, was not prohibited from paying dividends in those years, notwithstanding it then had no earned surplus. The petitioner controverts this contention and insists that the term means the net earnings of the corporation from its inception.

"Net earnings" is not defined in the Michigan statute, nor is it qualified therein by any words definitely stating any certain period for which they are to be computed. Net earnings of a corporation, as a general proposition, have been defined as "the excess of the gross earnings over the expenditures defrayed in producing them, aside from, and exclusive of the expenditure of capital * * *." *Union Pacific Railroad Co.* v. *United States*, 99 U. S. 402, 420; see also *Mobile & Ohio Railroad* v. *Tennessee*, 153 U. S. 486; and *R. M. Weyerhaeuser*, 33 B. T. A. 594. And dividends are payable out of both current and accumulated earnings. *Lynch* v. *Hornby*, 247 U. S. 339. The common and ordinary meaning of the term "net profits," uniformly recognized by the courts, takes into account losses sustained and capital invested in the business. "Net profits" are "the clear pecuniary gain remaining after deducting from the gross earnings of the business the expenses incurred in its conduct, the losses sustained in its prosecution, and the capital invested." *Lich* v. *United States Rubber Co.*, 39 Fed. Supp. 675; affirmed per curiam, 123 Fed. (2d) 145; *Hunter* v. *Roberts, Throp & Co.*, 83 Mich. 63; 47 N. W. 131; *Guaranty Trust Co.* v. *Grand Rapids, G. H. & M. Railway Co.*, 7 Fed. Supp. 511; affd., 85 Fed. (2d) 331; *Fraser* v. *Great Western Sugar Co.*, 29 Fed. (2d) 810. Cf. *National Newark & Essex Banking Co.* v. *Durant Motor Co.*, 1 Atl. (2d) 316; 124 N. J. Eq. 213; affd., 5 Atl. (2d) 767. In the *Fraser* case the court quotes with approval authority to the effect that the actual value of the assets with which the corporation began business is to be deducted and that the business of a corporation is to be viewed as a unit in determining whether there are net profits. In *Willcuts* v. *Milton Dairy Co.*, 275 U. S. 215, the Court held that a corporation can not have undivided profits unless the net assets exceed the capital stock, and that, therefore, where capital is impaired, profits, though earned and remaining in the business, are

---

[3] Under the second paragraph of section 21.22 dividends may also be paid on preferred stock from any surplus.

not surplus or undivided profits if they are insufficient to offset the impairment.

While we are without the benefit of an interpretation of its present statute by the courts of Michigan, we think the foregoing authorities fully support the petitioner's contention that it was prohibited from paying dividends during the existence of the deficit. The *Lich* case, *supra*, provides a complete answer to the construction of the Michigan statute contended for by the respondent. The New Jersey statute there under consideration provided that the directors "shall not pay dividends except from its surplus * * * or from the net profits arising from the business," and the corporation there, as in the present case, had a deficit in excess of its net earnings of the current year. It was contended that the term "net profits" should be construed as meaning "annual net earnings" and that in determining the net profits for the current year the losses of prior years should be disregarded. In its opinion the court said:

What are "net profits" within the meaning of the statute? The statute is devoid of any definitive answer. The term, however, is one of common usage and the ordinary acceptation must be adopted. The term connotes the clear pecuniary gain remaining after deducting from the gross earnings of the business the expenses incurred in its conduct, the losses sustained in its prosecution, and the capital invested [citing cases]. It is a prerequisite to the existence of net profits that the assets of a corporation exceed the liabilities, including the liability on the capital stock. Where capital is impaired, annual net earnings, if insufficient to offset the impairment, do not constitute net profits. *Willcuts* v. *Milton Dairy Company*, 275 U. S. 215, 218; * * * *Foley Securities Corp.* v. *Commissioner* * * *, 106 F. 2d 731, 733. The term net profits is not synonymous with the term annual net earnings. Annual net earnings may be productive of net profits, or, as in the instant case, reductive of the deficit. * * *

In the immediate case there were, in the years in question, * * * no net profits to which the inchoate right to dividends could have attached. There was, * * * in each of the said years, a substantial deficit which greatly exceeded the annual net earnings of the corresponding year, and, to the reduction of which the annual net earnings were applied. It is manifest, therefore, that the annual net earnings of each of the said years resulted, not in a profit, but in a reduction of the deficit. There was in each of the said years no source from which dividends could have been paid lawfully; the payment of dividends under the circumstances would have been unlawful.

The court's construction * * * finds support in the case of *National Newark & Essex Banking Co. et al.* v. *Durant Motor Co. et al.*, 124 N. J. Eq. 213, 1 A. 2d 316, * * * in which it was stated: "Our statute forbids the payment of dividends except from surplus or 'from the net profits arising from the business of the corporation.' * * * In my opinion, no dividends out of net profits are earned until there is a balance of assets over liabilities, arising from the business of the corporation. * * *

It is in effect contended by the plaintiff that the statutory term "net profits" is synonymous with "annual net earnings", and that in determining the net profits for the years in question, the losses of preceding years, as indicated by the deficit, may be disregarded. The fallacy of this contention is obvious. This theory would permit that which the statute * * * expressly prohibits, to

wit, the payment of dividends out of annual net earnings, even though such payment resulted in an impairment of capital. The payment of dividends out of annual net earning when, as in the immediate case, a deficit exists, would result in an impairment of capital, \* \* \*

It must be presumed that the Legislature of Michigan used the term "net earnings" in its ordinary and commonly accepted meaning. If it had been the intention to limit it to earnings of a particular year, it would have been a simple matter to do so by the insertion of the words "annual" or "current" preceding the term "net earnings." In some states which have adopted the policy of permitting the payment of dividends during the existence of a deficit, the legislators have resorted to language adequate to express that intention. See Rev. Code Del., 1935, § 2066; Cal. Civ. Code, 1937, § 346.

We are of the opinion that the petitioner is entitled to the credits claimed under section 26 (c) (3), and we so hold.

The second issue for decision is whether in determining the petitioner's undistributed adjusted net income for personal holding company surtax purposes for each of the years 1935, 1936, and 1937, the petitioner is entitled to deduct certain amounts paid to the Senior Corporation in those years as amounts used to pay or to retire indebtedness incurred prior to January 1, 1934. Sec. 351 (b) (2) (B), Revenue Acts of 1934, 1936, and sec. 355 (b), Revenue Act of 1936, as added by sec. 1, Revenue Act of 1937.[4]

The petitioner contends that prior to January 1, 1934, it was indebted to the Senior Corporation in the sum of $2,567,494.46 as shown by petitioner's and the Senior Corporation's current accounts, and that it should receive credits as against that sum in the amounts of $458,068.92, $393,931.07, and $125,000 for the respective taxable years 1935, 1936, and 1937 for the reason that such amounts paid in those years should be applied to the $2,567,494.46 because the latter sums embraced the oldest items on petitioner's and the Senior Corporation's current accounts. The respondent controverts this contention, on the grounds that, even if the transactions as reflected in such current accounts were based upon a true debtor and creditor relationship, a charge to the

---

[4] SEC. 351. \* \* \*

(b) DEFINITIONS.—As used in this title—

\*      \*      \*      \*      \*      \*      \*

(2) The term "undistributed adjusted net income" means the adjusted net income minus the sum of:

\*      \*      \*      \*      \*      \*      \*

(B) Amounts used or set aside to retire indebtedness incurred prior to January 1, 1934, if such amounts are reasonable with reference to the size and terms of such indebtedness;

By section 355 of the Act of 1936 added by section 1 of the Revenue Act of 1937 and effective for taxable years beginning after December 31, 1936, clause (B) was changed to read:

"(b) Amounts used or irrevocably set aside to pay or to retire indebtedness of any kind incurred prior to January 1, 1934, if such amounts are reasonable with reference to the size and terms of such indebtedness."

144

Senior Corporation by petitioner on petitioner's current account and a corresponding entry on the Senior Corporation's current account show that the $2,567,494.46 was paid or discharged on January 31, 1938, and therefore subsequent to the taxable years; and, in the alternative, respondent contends those transactions as reflected in the respective current accounts were not realities based upon a true debtor and creditor relationship in that those transactions and the existence of the Senior Corporation collectively constituted a mere fiction.

It appears from the record that for the year 1936 the respondent has determined a deficiency in income tax of $132,261.91 and an overassessment in personal holding company surtax of $44,244.69. Since we have no jurisdiction of overassessments (*Cornelius Cotton Mills*, 4 B. T. A. 255), the proceeding must be dismissed in so far as it pertains to the personal holding company surtax for the year 1936. *Will County Title Co.*, 38 B. T. A. 1396; *Union Telephone Co.*, 41 B. T. A. 152; *Hobbs Western Co.*, 43 B. T. A. 5.

The current accounts of petitioner and the Senior Corporation disclose a balance due from the petitioner to the Senior Corporation of $2,567,494.46 at December 31, 1933, as a result of transactions occurring in the period August 28, 1933, to December 31, 1933; and the amounts here claimed as deductions are the amounts of $458,066.92, $393,931.07, and $125,000, which are the total amounts shown by petitioner's current account to have been debited to the Senior Corporation and by the Senior Corporation's current account to have been credited to petitioner in the respective taxable years 1935, 1936, and 1937. It appears also from those current accounts that during the years 1934 to 1937 the petitioner was charged with amounts which in the aggregate largely exceeded the total amount of the credits received by it during those years.

The deduction allowed by the statute is for "amounts used * * * to retire indebtedness incurred prior to January 1, 1934," and the burden rests upon the petitioner to show that it comes clearly within the terms laid down in the statute. *New Colonial Co.* v. *Helvering*, 292 U. S. 435. In *Pembroke Realty & Securities Corporation*, 42 B. T. A. 341 (reversed on another ground, 122 Fed. (2d) 252), we said that it is reasonable to assume that "indebtedness incurred prior to January 1, 1934" (the crucial date there) was intended to refer to debts which, under the local law governing the relations of debtor and creditor, would be treated as having been incurred prior to that date. The rule prevailing in Michigan is stated in *Mauro* v. *Davie*, 236 Mich. 309; 210 N. W. 308, as follows:

The debtor may direct the application [of the payment] before or at the time the payment is made. If he does not, the creditor may apply it as he pleases, either at the time the payment is made or afterwards, if before any controversy arises concerning it. In the absence of direction on the part of the debtor or application by the creditor, if the credit merely appears in the general account

and there be no evidence of an understanding to the contrary, the credit will be applied to the debits in the order of time in which the debits occur. [Brackets supplied.]

See also *Jarecki Mfg. Co.* v. *Ragir*, 272 Mich. 689; 262 N.W. 323; and *Wanner* v. *Snider*, 289 Mich. 464; 286 N.W. 685. This rule obtains in many other jurisdictions. 48 C. J. 653, ¶104.

In our opinion, the petitioner is not entitled to have the Michigan rule invoked in its favor. The running accounts of petitioner and the Senior Corporation in evidence show all the charges and credits and, with respect to the amounts claimed as payments, we are informed only that they were paid to the Senior Corporation or advanced on its behalf and were charged against it in the petitioner's current account with corresponding entries on the Senior Corporation's current account. Although the witnesses asserted complete knowledge of every transaction, they have not indicated that no direction was made by the debtor and no application was in fact made by the creditor, nor did they testify that no express understanding existed with respect to the application of specific payments. In our opinion, the rule is not to be applied in the absence of evidence upon which a specific finding can be made as to the existence of those conditions which are held by the law of Michigan to be necessary for the application of the rule. See *Jarecki Manufacturing Co.* v. *Ragir, supra.*

The current account of the petitioner and the corresponding current account on the books of the Senior Corporation contain entries made under date of January 31, 1938. The entry on the Senior Corporation's current account shows that the petitioner on that date was credited with the amount of $2,567,494.46, this being the identical amount of the balance of the indebtedness shown by the two current accounts of petitioner and the Senior Corporation to have been owing by the petitioner to the Senior Corporation at December 31, 1933. The entry on petitioner's current account shows that the same amount was, on the same date, charged to the Senior Corporation, the entry being accompanied with a notation "T/S to 771 Bal. 1/1/34." These parts of the accounts were introduced in evidence, without qualification, and none of the witnesses explained the nature of the transaction represented by this entry.

The book entries of January 31, 1938, standing alone, may not be conclusive evidence of an actual payment on that date by the petitioner of the amount of $2,567,494.46 to the Senior Corporation, but they are evidence of the fact that on that date the petitioner received a credit on the books for the identical amount of the indebtedness which was shown by other entries and in the same accounts to be due to the Senior Corporation on December 31, 1933. The entries are inconsistent with the theory here advanced by the petitioner that the amounts appearing in the accounts as credits in favor of petitioner

for the years 1935, 1936, and 1937 were payments on account of the indebtedness existing at January 1, 1934. On the record as it stands we are unable to make a finding that the amounts credited in the accounts during the years 1935 and 1937 were amounts used to retire the indebtedness existing at January 1, 1934, and; for that reason, the determination of the respondent (involved in the second issue and in so far as it pertains to the taxable years 1935 and 1937) in disallowing the deductions is approved.

The failure of the petitioner to show by its proof that any amount was paid in the years 1935 and 1937 to retire such indebtedness renders unnecessary consideration of the question whether the deductions claimed for those years should be denied upon the alternative contention of the respondent, although many facts of record, which are not set out in our findings are pertinent to that contention.

> *Decision will be entered under Rule 50, except that in so far as the proceeding pertains to personal holding company surtax for the year 1936 an order will be entered dismissing the proceeding for want of jurisdiction.*